```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2

 3   UNITED STATES OF AMERICA,      )
                                    ) Case No. 6:24-MJ-04013-1
 4                                  )               (MWP)
                  Plaintiff,        )
 5                                  )
     vs.                            ) March 6th, 2024
 6                                  ) 2:06 p.m.
     TIMOTHY JACKSON, JR.,          )
 7                                  )
                  Defendant.        )
 8

 9         TRANSCRIPT OF CONTINUATION OF DETENTION HEARING
             BEFORE THE HONORABLE MARIAN W. PAYSON
10                UNITED STATES MAGISTRATE JUDGE

11

12   APPEARANCES:

13   For the Plaintiff:     TRINI E. ROSS
                            UNITED STATES ATTORNEY
14                          BY:  ROBERT MARANGOLA, ESQ.
                            ASSISTANT UNITED STATES ATTORNEY
15                          100 State Street
                            Rochester, NY 14614
16
     For the Defendant:     LAW OFFICES OF MAURICE J. VERRILLO, P.C.
17                          BY:  MAURICE J. VERRILLO, ESQ.
                            3300 Monroe Avenue, Suite 301
18                          Rochester, NY 14618

19   Audio Recorder:        LISA DUQUE

20   Transcriber:           MEGAN E. PELKA, RPR
                            Robert H. Jackson US Courthouse
21                          2 Niagara Square
                            Buffalo, NY 14202
22                          (716) 229-0880

23        Proceedings recorded with electronic sound recording,
     transcript prepared with computer-aided transcription.
24

25
```

1          THE CLERK:  All rise.  Judge Payson presiding.
2          THE COURT:  Please be seated.
3          THE CLERK:  United States of America v.
4   Timothy Jackson, Jr., 24-MJ-4013.
5          THE COURT:  Good afternoon.
6          MR. MARANGOLA:  Good afternoon, Your Honor.
7          MR. VERRILLO:  Good afternoon, Judge.
8          THE COURT:  Since the Court's last appearance, this
9   last appearance in this case in early February, I did receive
10  at my request from the government a CD that contained two
11  recorded conversations, which the government has indicated
12  Mr. Jackson participated in.  The CD also contained
13  transcripts of the two communications, or at least two
14  conversations, or at least a portion, I think, of one of them.
15  And I believe the second one was transcribed in its entirety.
16         Mr. Verillo, you received that CD?
17         MR. VERRILLO:  I didn't receive the CD.  I had the
18  transcripts previously.
19         THE COURT:  Okay.
20         MR. VERRILLO:  That had been given to me.
21         THE COURT:  Okay.  And you made a reference in your
22  proffer that one of the conversations that the government
23  discussed and highlighted, which the government says reflects
24  that Mr. Jackson , at least on that occasion, resorted to
25  threats to one of his workers, threats which included shooting

1   somebody.  I think the government's -- defense's contention

2   was that no one took that conversation seriously, as evidenced

3   by the fact that there was laughing during the transcript.

4   And so, I am assuming from that that you did listen to it.

5           MR. VERRILLO:  That's correct.  I had the transcript.

6           THE COURT:  Okay.  I just wanted --

7           MR. VERRILLO:  I had the transcript.  I had other

8   calls, Your Honor, but that one I did not have.

9           THE COURT:  Okay.

10          MR. VERRILLO:  I had other calls that I listened to,

11  but that one I did not have.

12          THE COURT:  That's fine.  Did you want to listen to

13  it?  That's --

14          MR. VERRILLO:  I don't know how long of a video --

15  how long of an audio it is.

16          THE COURT:  It is relatively long, and I am not going

17  to sit in here and play it.

18          MR. VERRILLO:  No, no.  I'm just saying.

19          THE COURT:  I'm saying that we take an adjournment

20  of -- I agree that there is laughing that is going on in the

21  call, but I just wanted to make sure that, you know , if you

22  wanted to listen to it, you could listen to it.

23          MR. MARANGOLA:  Judge, I'm sorry.  That call is in

24  the complaint and that was on the disc that was initially

25  provided with all the --

```
 1              THE COURT:  I know it was in the complaint.
 2              MR. MARANGOLA:  Right.  Well, Mr. Verillo indicated
 3   he just had a transcript.  So, he had the disc with recordings
 4   and the transcript.
 5              THE COURT:  Okay.  Because it was in the complaint --
 6              MR. MARANGOLA:  Yeah, it was on that.
 7              THE COURT:  -- the disc that you received initially
 8   did have it in there.
 9              MR. MARANGOLA:  Yeah.
10              THE COURT:  And I know you made some references to
11   laughing.
12              MR. VERRILLO:  Right.
13              THE COURT:  So I thought you had listened to it.
14              MR. VERRILLO:  I had a number of calls, and I may
15   have missed that one, but I am not asking to listen to it at
16   this point.
17              THE COURT:  Okay.  I don't think I got anything else
18   after the detention hearing.  Anything else that either one of
19   you submitted?
20              MR. MARANGOLA:  No, Your Honor.
21              MR. VERRILLO:  No, Judge.
22              THE COURT:  All right.  And I indicated that I had
23   received information about properties that Mr. Jackson's
24   father was apparently willing to post, and I also received and
25   reviewed various letters of support.  I want to acknowledge
```

1  receipt of those again.  I am prepared to render my decision
2  unless there is any reason that I should not do so.
3           Mr. Verillo, you are not asking me to hold off on
4  rendering a decision?
5           MR. VERRILLO:  I think the Court should render a
6  decision, Your Honor.
7           THE COURT:  Okay.  Mr. Marangola moved for detention
8  at the initial appearance on a number of different grounds,
9  specifically, Title 18, United States Code Section
10 3142(f)(1)(A), (f)(1)(B), (f)(1)(C), (f)(2)(A), and (f)(2)(B).
11 Mr. Marangola also invoked the presumption that would apply in
12 the event that the Court were to determine that the charges
13 against Mr. Jackson were supported by probable cause, that is,
14 a presumption under the statute that, in certain cases,
15 Congress has determined that a presumption in favor of
16 detention should apply.  It is a rebuttable presumption, so
17 certainly a presumption that could be rebutted by the defense.
18    In evaluating the government's motion for detention, I
19 have re-reviewed at least significant portions of the
20 complaint.  I have re-reviewed the proffers made and I have
21 considered the proffers made by both sides.  I have considered
22 the Pretrial Services report and the information available to
23 me in the report, as well as the recommendation of detention
24 that is contained in the report.  Based on my review of the
25 information in the complaint and, more specifically, the

1 proffer made by the government, I make a separate
2 determination that the charges against Mr. Jackson are
3 supported by probable cause.
4     I say separate because the complaint was presented to me.
5 And in order for me to sign a complaint, I have to make a
6 determination based on the allegations in the complaint that
7 it is supported by probable cause.  But then, if the
8 government seeks to rely on the statutory presumption in favor
9 of detention, the Court is required to make a separate
10 probable cause determination at that time.
11     So, I am making a separate determination based on the
12 complaint as well as the additional information proffered to
13 me both by the government and the defense.  I do find probable
14 cause supports those charges and that the government is
15 entitled to rely on the presumption.
16     As I have indicated, it is a rebuttable presumption, and I
17 have considered the information that has been proffered by the
18 defendant in an effort to rebut the presumption, but I do
19 weigh the presumption along with my other considerations in
20 determining this motion.
21     The government has moved for detention both on the grounds
22 of risk of flight and danger.  As counsel knows, and the Court
23 is aware, those are two separate bases for detention and there
24 are two separate burdens of proof that apply to each of those
25 bases on which the government is relying.

1     With respect to the allegation by the government that
2  there -- that release of Mr. Jackson would pose a serious risk
3  of flight, and that there are no conditions or combination of
4  conditions that would reasonably assure his return to court
5  for surrender for the service of the sentence that may be
6  imposed, the government is required to establish that by a
7  preponderance of the evidence.
8     With respect to the government's contention that release
9  of Mr. Jackson would pose a danger to the community, and that
10 there are no conditions that would reasonably assure against
11 the danger to the community, the government bears of the
12 burden of establishing that proposition by a higher burden of
13 proof, that is, by clear and convincing evidence.  And I have
14 considered the different standards of proof in evaluating the
15 government's proffers.
16    I am required by law to consider various information that
17 is set forth under Title 18, United States Code, Section
18 3142(g).  I have considered the available information to me
19 with respect to those factors.  Some of that information
20 weighs in favor of Mr. Jackson.  He does -- he's a lifelong
21 resident of Rochester, although he's had some significant
22 periods of incarceration.  But when he's not been in custody,
23 he's been living in Rochester.
24    He has significant family support.  That is clear in the
25 report, clear at the detention hearing, clear by -- as a

1   result of his father's willingness to post property.  He has
2   had part-time employment in the City of Rochester through an
3   organization called Pathways to Peace, and there are no
4   significant medical or mental health issues that are noted
5   here.  So, I considered those factors and considered that they
6   weigh in favor of release.
7      Turning to risk of flight, while I think there is some,
8   you know, some grounds for the government's motion, I am not
9   persuaded that there are no conditions that could be set which
10  would assure the defendant's return to court.  I think there
11  are strict conditions that could be set.  Those conditions
12  would include posting of property and other strict conditions,
13  as I indicated.
14     I think that the stronger, much stronger, basis for the
15  motion is the contention that Mr. Jackson poses a risk of
16  danger, that his release poses a risk of danger to the
17  community.  I think I indicated that at the conclusion of the
18  detention hearing.
19     The charges that Mr. Jackson faces are plainly serious
20  charges.  They include narcotics violations, firearms
21  violations, which are considered to be crimes of violence.
22  They carry significant time and, as noted, they give rise to
23  the 924(c) to a -- and the controlled substance offense to a
24  presumption that there are no conditions that could be set
25  which would assure the danger of the community.

1     Based on the proffer made by the government acknowledging
2 that it's early in the case, the government certainly knows
3 the evidence better at this stage than the defense does, but
4 acknowledging that, the government's cases, which has been
5 investigated for a long period of time, appears to be a very
6 strong case and include very strong evidence pertaining to
7 Mr. Jackson.
8     In this drug conspiracy case, the government's
9 investigation has included and the charges are based upon
10 significant wiretap evidence that has been -- communications
11 that have been intercepted pursuant to wiretaps that have been
12 authorized for a number of different individuals' telephones,
13 including one that was seized from Mr. Jackson's residence at
14 the time the search warrants were executed, and the complaint
15 includes summaries of many conversations allegedly involving
16 Mr. Jackson, two of which I did listen to in recorded format
17 through the disc provided by the government.
18     In addition to wiretap evidence, the government's evidence
19 includes surveillance information that has been gathered over
20 a fairly long period of time by a number of different devices.
21 It includes controlled purchases made from drug houses
22 allegedly associated with the conspiracy, and those controlled
23 purchases were very numerous and began in 2021, and then the
24 execution of search warrants at many locations associated with
25 the drug conspiracy.

1    Starting first with the wiretap evidence, there are
2 numerous conversations that are summarized in the complaint,
3 and some of which Mr. Marangola summarized in the proffer, in
4 which Mr. Jackson is identified as a participant.  Some of
5 those conversations include information about him, which seems
6 consistent with what we know about Mr. Jackson.  By that, I
7 mean where he works, for example.
8    The government identified a conversation that is
9 summarized at pages 10 and 11 of the complaint.  It's a fairly
10 long conversation, and it's a significant conversation.  The
11 government has identified Mr. Jackson as a leader or at least
12 co-leader of the narcotics conspiracy, and that
13 characterization does appear to be well supported by the
14 conversations that have been summarized in the government's
15 complaint.
16    This particular conversation at pages 10 and 11 of the
17 complaint evidence Mr. Jackson's control -- apparent control
18 over the drug-selling operations and his role in directing
19 workers and then directing the operations of the organization.
20 In that conversation, he directs another co-conspirator to pay
21 attention to everything, mark it down.  He tells the worker
22 what the narcotics count means so that he can receive it, he
23 being Mr. Jackson.  He tells the worker how to count the
24 money, how to prepare it for him; indicates when it's all
25 counted, he'll come and get it.  Tells the worker to send him

1    the H count, send him the boy count, and send him the money

2    count.  He states, just follow the rules that I give and we

3    won't ever get caught.  He discusses security.  He tells the

4    worker about the need to keep the board on the door at all

5    times, to watch the cameras, to keep cuzzo (phonetic) on speed

6    dial.

7         That's just one example of a number in the complaint

8    evidencing Mr. Jackson's involvement in the conspiracy; but

9    significantly, for this detention hearing, his control over it

10   and his direction of those who work in various roles in the

11   conspiracy.

12        The organization, according to the complaint, and

13   according to the proffer, operated various drugs houses on

14   Angle Street, and the defendant is intercepted talking about

15   those operations.  There is discussion on one of those calls

16   about the movement of one drug house on Angle Street to

17   another drug house on Angle Street.  The pole camera footage

18   shows contents of one of those locations being moved to the

19   other location on Angle Street.

20        On pages 14 and 15, Mr. Jackson -- there's a summary of an

21   intercepted conversation between Mr. Jackson and Mr. Fuller

22   about supplying and resupplying one of their distributors.

23   And then, thereafter, Mr. Jackson is seen, through

24   surveillance, meeting with that distributor and, according to

25   that complaint, that pattern happened many times during this

1  conspiracy; that is, discussions with Mr. Jackson about the
2  need to supply or resupply a distributor and then surveillance
3  picking up Mr. Jackson meeting with that distributor,
4  specifically with page 20 with Mr. Adams, page 26 with
5  Mr. More, pages 87 to 92 with Mr. Lindsey.
6      Mr. Jackson tells co-conspirators how to cut or dilute
7  fentanyl, page -- and that is a conversation with Mr. Fuller,
8  I think, on December 14th.  Mr. Jackson does engage in
9  conversations in which he makes references to threats as part
10 of his supervision of this organization.  As to whether the
11 fact that they are laughing means that nobody takes those
12 threats seriously, I am really not in a position to evaluate
13 that.  I have listened to the conversation.  I agree that
14 there is laughing.
15     Nonetheless, I think when somebody runs a drug
16 organization, sells significant quantities of heroin and
17 fentanyl, fentanyl certainly being a particularly lethal drug,
18 and in large quantities is involved in supplying, resupplying
19 distributors, collecting significant sums of money, any threat
20 of resorting to violence, it is a concern, and I think that it
21 would be inappropriate to say that simply because somebody is
22 laughing, that means that they don't take that seriously.
23     That -- and, indeed, as Mr. Marangola also referenced,
24 another conversation was picked up, page 18, in which one of
25 the workers indicates that -- I think it's a she -- needs

1   another firearm because the one that Mr. Jackson -- the one
2   that had been provided to her is jamming, and he says he will
3   get another one for her.  And she said she needs it right
4   away.  That's on page 18.
5       So, again, a threat to shoot somebody when made in the
6   context of this kind of an operation that does include --
7   apparently include Mr. Jackson's involvement in providing guns
8   to some of her workers is not something that I can write off
9   as inconsequential or not serious.
10      The complaint also details a number of occasions in which
11  one of the coconspirators sells drugs to -- in a controlled
12  purchase to an undercover officer after, apparently, receiving
13  those drugs from Mr. Jackson.  There's a discussion about the
14  need to get drugs.  Mr. Jackson then meets with that
15  coconspirator, and then the undercover buys the drugs from
16  that coconspirator.
17          MR. MARANGOLA:  Judge, I believe it was an informant.
18  I don't think it was an undercover --
19          THE COURT:  Oh, I thought was an undercover.
20          MR. MARANGOLA:  I don't know if I misstated that
21  before, but I believe it was an informant.
22          THE COURT:  Okay.  And the government has also
23  indicated that surveillance has shown Mr. Jackson in and out
24  of Angle Street locations on a number of different days during
25  the course of the conspiracy.

1        With respect to search warrant evidence, a search warrant
2   was executed at Mr. Jackson's house.  Mr. Jackson was present,
3   along with his girlfriend, in the bedroom identified as the
4   master bedroom.  In a closet in that bedroom, the agents
5   seized a nine millimeter semi-automatic pistol next to a
6   magazine loaded with ammunition, $23,251 was seized from
7   Mr. Jackson's home along with a money counter.  That's from
8   somewhere on the landing of the residence.
9        Keys to a Tahoe that he was seen driving were found in a
10  City of Rochester coat in the residence.  In the Tahoe were
11  capsules -- empty capsules that match those found at various
12  of the Angle Street and other drug locations.  And, as I
13  indicated, one of the phones that had been intercepted was
14  also found in that -- in Jackson's house.
15       That evidence is significantly -- is significant and
16  corroborates the other evidence in the case.  From the various
17  drug locations, cocaine, fentanyl, loaded pistols and cash
18  were seized.
19       As far as Mr. Jackson's criminal history, it is, in my
20  mind, significant.  He has a prior drug felony offense in 2000
21  for attempted criminal possession of a controlled substance in
22  the third degree.  He received a relatively light sentence for
23  that; one year imprisonment.
24       Five years later, he was convicted of various firearms
25  offenses, criminal possession of a weapon in the third,

1  criminal possession of a weapon in the second, criminal
2  possession of a loaded firearm in the third, and received 15
3  years imprisonment, 5 years supervised release.  Those charges
4  stemmed, evidently, from Mr. Jackson's participation, along
5  with others, in a drive-by shooting.  As the report indicates,
6  several of Mr. Jackson's prior convictions were committed
7  while charges were pending, and he did also have a parole
8  violation.
9     Based on the seriousness of the charges, the strength of
10 the evidence, the fact that Mr. Jackson was discharged from
11 parole in February of 2022 as a very mature man, age-wise, at
12 that time following a 15-year sentence, that certainly would
13 have given him a long time to think about how he was going to
14 lead his life once he was released, he finds himself charged
15 in 2024 with involvement in and indeed leading a significant
16 drug-dealing operation which included the possession of
17 firearms connected to the drug-dealing operation.
18    The conspiracy itself is alleged to have begun in 2021
19 while Mr. Jackson was still on parole, although I have looked
20 at the complaint.  I don't see that there's any specific
21 allegation in the complaint about activity by Mr. Jackson at a
22 time while he was under parole supervision.  So, I want to
23 make that clear.  But, nonetheless, it is very significant to
24 me that he certainly had not been discharged from parole for
25 very long before -- as I said, he finds himself before this

1   Court facing very, very serious charges that are supported by
2   a lengthy investigation, including many different forms of
3   investigative techniques.
4       Based on that, I conclude that there are no conditions or
5   combination of conditions which would assure the safety of the
6   community if Mr. Jackson were to be released.  I make that
7   determination by -- or I find that the evidence that I have
8   cited, the proffer, the complaint, that that evidence amounts
9   to clear and convincing evidence that there are no conditions
10  that can be set to assure the safety of the community.  I deny
11  the government's motion for detention as it pertains to risk
12  of flight.
13      Mr. Verillo is certainly free to seek review of this
14  determination.  Mr. Verillo, we have got another court
15  appearance that's coming up.  It may be --
16          MR. VERRILLO:  Two weeks, I believe it is.
17          THE COURT:  Do you want to keep that on?
18          MR. VERRILLO:  Yes.  Judge, I wanted to update you.
19  I did give Mr. Marangola an external drive.  Apparently, the
20  discovery is quite extensive.  So, I have received a little
21  bit, but there's much more that I need to receive.  So, I
22  understand that he was hoping to have that to me by early next
23  week, the external drive.  So, I am thinking realistically, if
24  we have 45 days from that, you know, to look through that, I
25  am looking at around the 26th of April to complete, hopefully

1  to be available to review that and then go from there.
2      MR. MARANGOLA: Judge, that's -- I have no problem
3  with the -- adjourning the matter. That part -- Mr. Verillo
4  did provide me that drive that I indicated we would need,
5  because the extent of the discovery cannot, all of it, be
6  provided on the another platform, the file sharing platform
7  that we have used for some cases.
8      THE COURT: Okay.
9      MR. MARANGOLA: So, I think the requested adjournment
10 is appropriate.
11     THE COURT: And I gather Mr. Verillo is suggesting
12 April 26th, that's a Friday. You like that date,
13 Mr. Marangola?
14     MR. MARANGOLA: The 26th I don't, but either the 25th
15 or the 29th are better for me.
16     MR. VERRILLO: Okay. The 25th is bad for me, so
17 let's say the 29th? The 29th is a Monday.
18     THE COURT: Okay. The 29th is --
19     MR. VERRILLO: That would be okay.
20     THE COURT: The 29th is okay. Why don't we say 9:30
21 on the 29th?
22     MR. MARANGOLA: That's fine with me, Judge.
23     THE COURT: Okay.
24     MR. VERRILLO: Yes.
25     THE COURT: We'll put this on for a status. You are

1 not asking for a preliminary hearing, correct?

2         MR. VERRILLO:  Correct.  I am reserving my rights on

3 that.

4         THE COURT:  Okay.  Asking for an interest of justice

5 exclusion?

6         MR. VERRILLO:  Yes, Judge.

7         THE COURT:  Okay.

8         MR. MARANGOLA:  Government joins that request.

9         THE COURT:  Joint request to exclude time is granted.

10 Time is excluded between today and April 29th in the interest

11 of justice under 18 USC, Section 3161(h)(7).

12    I find Mr. Jackson's interest, the government's interest

13 and the public's interest in both a speedy indictment and a

14 speedy trial are outweighed by Mr. Jackson's interest in

15 having enough time with and through his counsel to review the

16 voluminous discovery that has just been referenced to allow

17 Mr. Jackson to confer with Mr. Verillo about that discovery as

18 well as his options, whether to ask for a preliminary hearing,

19 or whether to engage in plea negotiations with the government.

20     For all those reasons, time is excluded between today and

21 April 29th under 18 USC Section 3161(h)(7).  Okay.  Thank you.

22         MR. MARANGOLA:  Thank you, Judge.

23 (Proceedings concluded at 2:36 p.m.)

24

25

18

1                   <u>CERTIFICATE OF TRANSCRIBER</u>

2

3      In accordance with 28, USC, 753(b), I certify that

4 this is a true and correct record of the proceedings held in

5 the United States District Court for the Western District of

6 New York before Honorable Magistrate Judge Marian W. Payson on

7 March 6th, 2024.

8

9

10                             <u>s/ Megan E. Pelka, RPR</u>

11                             Megan E. Pelka, RPR

12                             Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25