1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

3   UNITED STATES OF AMERICA,     )
                              ) Case No. 6:24-MJ-04013-1

4                                 )               (MWP)
               Plaintiff,   )

5                                 )
vs.                        ) February 2nd, 2024

6                                 ) 9:06 a.m.
TIMOTHY JACKSON, JR.,       )

7                                 )
               Defendant.   )

8

9             **TRANSCRIPT OF DETENTION HEARING**
     **BEFORE THE HONORABLE MARIAN W. PAYSON**

10          **UNITED STATES MAGISTRATE JUDGE**

11

12   <u>APPEARANCES</u>:

13   For the Plaintiff:   TRINI E. ROSS
                      UNITED STATES ATTORNEY

14                         BY:  ROBERT MARANGOLA, ESQ.
                      ASSISTANT UNITED STATES ATTORNEY

15                         100 State Street
                      Rochester, NY 14614

16

17   For the Defendant:   LAW OFFICES OF MAURICE J. VERRILLO, P.C.
                      BY:  MAURICE J. VERRILLO, ESQ.

18                         3300 Monroe Avenue, Suite 301
                      Rochester, NY 14618

19   Audio Recorder:     LISA DUQUE

20   Transcriber:        MEGAN E. PELKA, RPR
                      Robert H. Jackson US Courthouse

21                         2 Niagara Square
                      Buffalo, NY 14202

22                         (716) 229-0880

23           Proceedings recorded with electronic sound recording,
transcript prepared with computer-aided transcription.

24

25

1          THE CLERK:  Judge Payson presiding.  United States v.

2    Timothy Jackson, Jr., 24-mj-4013.

3          THE COURT:  Good morning.  This matter is scheduled

4    for a detention hearing this morning.  I want to note that, in

5    preparation for the detention hearing, I have reviewed a

6    Pretrial Services report.  It does recommend Mr. Jackson's

7    detention.  It is dated January 26th.  Counsel, do you have a

8    copy of that report?

9          MR. VERRILLO:  Yes, Judge.

10          MR. MARANGOLA:  I do, Your Honor.

11          THE COURT:  And I have a letter from Mr. Verrillo

12    that I looked at before our last appearance with some proposed

13    properties identified for posting.  That letter is dated

14    January 26th docketed at Document 29.  Mr. Marangola, you've

15    seen that?

16          MR. MARANGOLA:  I have, Your Honor.

17          THE COURT:  Okay.  And, Mr. Verrillo, you haven't

18    supplemented this particular letter, correct?

19          MR. VERRILLO:  That's correct.

20          THE COURT:  Okay.  And I have also been given copies

21    of nine letters of support that Mr. Verrillo provided to the

22    Court.  Have you seen those, Mr. Marangola?

23          MR. MARANGOLA:  I have, Your Honor.

24          THE COURT:  Okay.  Mr. Verrillo, have you submitted

25    anything else in writing?

1          MR. VERRILLO:  No, Judge.

2          THE COURT:  Okay.  And, Mr. Marangola, you haven't

3    either?

4          MR. MARANGOLA:  I have not.

5          THE COURT:  Okay.  All right.  With that said, are

6    both parties prepared to proceed?

7          MR. MARANGOLA:  I am, Your Honor.

8          MR. VERRILLO:  Yes, Judge.

9          THE COURT:  Okay.  Go ahead, Mr. Marangola.

10         MR. MARANGOLA:  Thank you, Judge.  The government is

11   moving for detention of the defendant pursuant to Title 18,

12   United States Code, Section 3141(f)(1)(A), in that the

13   defendant is charged with a crime of violence.  The 924(c)

14   offense, as well as the felon in possession of a firearm

15   offense, qualifies as crimes of violence.

16      Under (f)(1)(B), in that the maximum sentence for an

17   offense that he is charged with is life imprisonment, that is

18   the 924(c) offense as well as the 841(b)(1)(A) amount in the

19   conspiracy charge.

20      And, under (f)(1)(C), in that the defendant is charged

21   with a drug offense under the Controlled Substances Act for

22   which there is a sentence of imprisonment of ten years or

23   more; as well as under 3142(f)(2)(A), in that there's a

24   serious risk that the defendant would flee; and under

25   (f)(2)(B), in that there is a serious risk that such person

1    would attempt to obstruct justice or attempt to threaten,

2    intimidate, or -- threaten or intimidate a prospective

3    witness.  Those are the statutory bases upon which the

4    government is making its motion today.

5        I would also ask that the Court apply the presumption set

6    forth in 3142(e) of Title 18, which indicates that there is a

7    presumption of both dangerousness as well as risk of flight if

8    probable cause has been established that an offense for which

9    a maximum term of imprisonment of ten years or more is

10   prescribed under the Controlled Substances Act, or an offense

11   under 924(c), both of which are applicable in this case.

12       At this point, I should go right into the (g) factors and

13   starting first with 3142(g)(1), the nature and circumstance of

14   the offenses charged; including, among other things, whether

15   the offenses involve a controlled substance, firearm, or crime

16   of violence.  This case involves all three, Your Honor; a

17   crime of violence, multiple controlled substances, and

18   multiple firearms.

19       With regard to the nature and circumstances of the

20   offense, this defendant runs a drug trafficking organization

21   that distributes large quantities of cocaine and fentanyl in

22   the City of Rochester.  The investigation has revealed that he

23   uses multiple locations on Angle Street, some of whom are

24   listed in his father's name.  These locations are used to

25   store, process, package, and distribute street-level

 1    quantities of cocaine, crack cocaine, and fentanyl.  There are

 2    drug houses on Angle Street, which is a small one-way street

 3    off of Lyell Avenue.  They are fortified with two by fours,

 4    camera surveillance systems, and firearms.  Some of them have

 5    tents --

 6              THE COURT:  Can you slow down just a little bit?

 7              MR. MARANGOLA:  Sure.

 8        Some of these locations have tents in the rear yard that

 9    have been set up to permit users to immediately consume the

10    drugs that are being sold.

11        During the investigation, the drug trafficking

12    organization switched from different houses on Angle Street.

13    They did that for multiple reasons; including harassment from

14    neighbors, or to thwart police detection.  They would set up

15    workers at one location to steer customers to the new location

16    so they wouldn't lose any business.

17        At the houses, workers would either sell drugs, they would

18    report to the higher-ups, including Mr. Jackson, the quantity

19    of drugs sold, the quantity of drugs left for sale and the

20    quantities of cash on hand.  The defendant also personally

21    sold larger quantities of cocaine and crack cocaine to

22    mid-level distributors in the City of Rochester.

23        The investigation revealed that the defendant is,

24    unquestionably, the leader and mastermind of this drug

25    trafficking organization.  That's essentially an outline of

1    the nature and circumstances of the offense charged.

2        Moving to the second of the (g) factors, the weight of the

3    evidence against the person.  The weight of the evidence

4    against Mr. Jackson, I would submit to the Court, is

5    overwhelming.

6        The proof of the conspiracy can be divided up into wiretap

7    calls, surveillance, controlled purchases of narcotics, and

8    search warrant evidence.  I'll discuss those four broad

9    categories of evidence, which establishes the existence of the

10   conspiracy and the defendant's participation in that.

11       First, with respect to the wiretap calls of members of

12   this conspiracy, including the defendant, Your Honor has seen

13   the approximately 94-page affidavit underlying the criminal

14   complaint, Judge, and I don't intend to read all of the items

15   in that for the Court that apply to the defendant.  I think

16   there's a substantial amount that do, but I would like to

17   highlight some of them.

18       With respect to the wiretap calls, there are calls in

19   which the defendant directs and instructs workers on how he

20   wants his operation run, the consequences of it not running

21   that way, and describing how they will not get caught as long

22   as they operate in the fashion he directs.  And I am referring

23   to a call on pages 10 and 11, and I'll just read just a couple

24   experts, if I may, Your Honor, from that.  And I apologize for

25   the language in advance.  The -- and these are words all from

1   Mr. Jackson:  "That's my next phase I was about to explain to

2   you.  I mean, we moving on strategic time.  We ain't trying to

3   be out doing bullshit.  We moving very strategic.  Don't

4   nobody really know what we doing.  Quick sneak move get the

5   fuck back to what we supposed to get to.  Take the money,

6   count everything you got left.  Everything.  Send me the boy

7   count, the H count, and the money count.  When you all got it

8   counted, then I am going to come and get it."

9       And the investigation has revealed that the boy count is a

10  reference to the number of bags of fentanyl that had been

11  sold.  The H count is a reference to the bags of cocaine, and

12  the money count is a reference to how much cash is left from

13  the sales.  In that call, he's talking to one of the workers

14  in the house and he says, "They still running.  Your boy is

15  great at what he do, but the other one" --

16           THE COURT:  Sorry, where are you?

17           MR. MARANGOLA:  I am in that same call on page 10.

18           THE COURT:  Yeah, but in -- right in the middle?

19           MR. MARANGOLA:  I am toward the bottom portion of it

20  now, the second portion attributed to Mr. Jackson from the

21  bottom.

22           THE COURT:  Okay.

23           MR. VERRILLO:  "Your boy is great at what he do, but

24  the other one goofy.  I doubt he will be ever great at this

25  type of work because his mind not really on it.  See how he

1    sitting here watching this shit right now?  He not sitting

2    here watching shit."

3        This type of work, Your Honor, is a reference to the drug

4    dealing operation that he's discussing.  He's talking at the

5    bottom portion with this worker stating, "He not on the radio

6    neither.  He's nothing -- he's doing nothing.  He in la la

7    land.  All I can do is throw it up to the cocaine Gods and

8    hope they don't hit that motherfucking house because he ain't

9    ready."

10       I would submit, Your Honor, that he's telling this other

11   person that his friend -- he's hoping that the police don't

12   just hit the house because his friend isn't watching for law

13   enforcement to come to the house, and he's just hoping that

14   they won't come and find the cocaine that they have being sold

15   there.

16       On the next page, on page 11, he talks -- continuing, he

17   states, "You okay, D?  You just follow the rules that I gave

18   you of this shit.  We ain't ever going to get caught, because

19   that's what we do.  We follow the order.  I know you fuck up

20   between bags sometimes.  I know what the fuck you got going

21   on, but for the most part, [N-word] is on point.  Pay

22   attention, [N-word], we can't lose."

23       And then later, in reference to the other worker, he

24   states, "He don't know.  Keep the board on the door all the

25   time.  Watch the cameras, you know?  He cuzzo (phonetic) on

1    speed dial.  He don't know that shit."

2       And later in that portion, "They not operating how we

3    operate.  That's why I tell y'all, y'all ain't getting paid to

4    babysit.  Y'all know how long we been doing this shit?  Do you

5    know how smooth we run the program?  Man, shit, we running

6    shit a little too smooth.  I am starting to think we need to

7    endeavor into some different type of motherfucking hustle,

8    because we kind of satin with this one.  We getting invisible,

9    right?  Everybody pay attention.  Everybody on they job."

10      There's a call on page 16 to 17, Your Honor, where the

11   defendant threatens one of his workers if she quits.  Talks

12   about -- he and Mr. Fuller are describing with her what's

13   going to happen to her, telling her, "This ain't about what we

14   have to do.  This about what we gonna to do.  This not a

15   threat.  This just telling you."

16      Later, he talks again about firing another worker and

17   wanting to punch her in the face after arguing with her --

18   with Mr. Fuller about getting paid twice.  That call, which I

19   won't go into, is on page 42 through 45.  At the end of that

20   call is where, after a long conversation, the defendant says,

21   "Cuzzo, I punch her in her face, man."  There's calls where

22   he's asked to and agrees to provide a gun to a worker at a

23   drug house.  That's on pages 17 to 18.  And then, there's also

24   a call where he's --

25             THE COURT:  Hold on.  Seventeen to eighteen?

 1          MR. MARANGOLA:  Yes, Judge.  And there's also a call

 2     where he's --

 3          THE COURT:  Hold on.  I just want to look at it.

 4          MR. MARANGOLA:  Sure.

 5          THE COURT:  Okay.

 6          MR. MARANGOLA:  And on page 52, he calls up another

 7     worker at a drug house to tell them to be on point, be on the

 8     look out, because a distributor spot was hit by the police,

 9     meaning raided by the police, just that morning on

10     Murray Street.  And the location that he's talking about is at

11     423 Murray Street, which is the drug house of one of the

12     distributors that he would sell drugs to.

13          In addition to the wiretap calls, a few of which I have

14     highlighted here, there is surveillance of this defendant.

15     There is live surveillance by police officers.  There are --

16     there is pole camera footage.  There is GPS data from trackers

17     on vehicles used by this defendant and other members of the

18     conspiracy.  They show him meeting for drug deals with members

19     of this conspiracy.  They show him entering and leaving the

20     drug locations on Angle Street as well.

21          In addition to the wiretap calls and the surveillance, we

22     have controlled purchases of narcotics from informants from

23     the drug houses in this conspiracy as well as the drug house

24     on Murray Street by one of the mid-level distributors that the

25     defendant supplies.  During the investigation from 2021 to the

1  present time, we have over 40 confidential informant buys of

2  drugs from either 19, 49, 69, or 96 Angle Street.

3      In addition, we have controlled informant purchases from

4  one of the distributors that I mentioned who was being

5  supplied by the defendant.  Just in the month of January

6  alone, on three separate occasions, a confidential informant

7  contacted a distributor.  The distributor immediately

8  contacted the defendant over the wiretap.  Those calls were

9  intercepted.  The defendant then met the distributor,

10  resupplied him.  The distributor then supplied the cocaine to

11  the informant.

12          THE COURT:  Are those transactions summarized in the

13  complaint?

14          MR. MARANGOLA:  They are.

15          THE COURT:  Do you have the paragraph references?

16          MR. MARANGOLA:  Sure, Judge.

17          THE COURT:  And you said that that was January of

18  this year?

19          MR. MARANGOLA:  Yes.  Those calls -- those controlled

20  purchases are summarized in paragraphs 219 through 232.

21          THE COURT:  Thank you.

22          MR. MARANGOLA:  And I will come back to those

23  specific controlled purchases in just a minute.  So, we have

24  the wiretap calls, the surveillance, the controlled purchases.

25  And then, with respect to the final category of evidence, the

1   search warrant evidence, Judge.  We have evidence from the

2   drug houses, from the coconspirator's houses, and from the

3   defendant's residence itself.

4       The drug houses, let's talk about those for a minute.  The

5   drug houses including 96, 69, 49, and 19 Angle Street.  At 96

6   Angle Street, law enforcement encountered the barricaded

7   location with surveillance cameras, extension cords running to

8   the backyard, approximately 500 purple capsules containing

9   cocaine, over 800 capsules containing fentanyl, a loaded 25-

10  caliber pistol, over $1,000 in US currency, and I believe

11  there was a drug worker inside that location.

12          THE COURT:  Which one was that?

13          MR. MARANGOLA:  That was 96 Angle Street.  At

14  49 Angle Street, which also had a surveillance camera system,

15  there were over 800 capsules of crack cocaine, a loaded nine

16  millimeter pistol with a defaced serial number, new and unused

17  plastic bags, and I believe there was also a worker inside

18  that location.

19      At the defendant's residence at 45 Willmont, where he was

20  located when the police entered at 6 a.m., and --

21          THE COURT:  Who else was there?

22          MR. MARANGOLA:  There was a female that was inside

23  that residence.  I don't have her name off the top of my head.

24  The -- just so -- as a little bit of an aside, the defendant

25  indicated in the Pretrial Report that he lived at 121 Bernard

 1   Street.  During the wiretap investigation, the tracker on his

 2   vehicle and the pole camera footage all reflected him staying

 3   at 45 Willmont Street overnight, not at 121 Bernard Street, as

 4   well as the ping on the wiretap phone that he was using.

 5   Inside the defendant's residence at 45 Willmont, law

 6   enforcement seized a nine millimeter handgun and ammunition on

 7   a closet floor, the bedroom closet floor.  They seized --

 8         THE COURT:  Loaded?

 9         MR. MARANGOLA:  The -- I believe the clip and the

10   ammunition were next to the gun.  I don't believe they were

11   inserted at the time.

12      In addition to the pistol and the ammunition, there was

13   also 20 -- over $23,000 in US currency at the defendant's

14   residence.  In that currency was buy money from one of the

15   controlled purchases from the informant that I just mentioned

16   a few minutes ago.  They had marked the serial numbers that

17   the informant had provided to the distributor before the

18   distributor -- before the informant gave it to the

19   distributor, and that money was in the defendant's house,

20   identified by serial number.

21      And, in making that sale -- by the way, as is, I believe,

22   set forth in the criminal complaint, the defendant went right

23   from supplying the distributor to 45 Willmont.  There's the

24   money cash -- there's also a money counter, which I would

25   submit to the Court is evidence of a need to count large

1    quantities of cash, which is very consistent with high-level

2    drug trafficking.

3        There was a coat, a City of Rochester coat, inside the

4    residence.  And in that coat, there were keys; keys which

5    operated the door locks at 45 Willmont, at 49 Angle Street,

6    the drug house where 800 bags of crack and a gun were, as well

7    as 19 Angle Street, which was used as a drug house during the

8    investigation.

9        There were also keys to the Tahoe, the Chevy Tahoe, that

10   the defendant was observed on surveillance driving throughout

11   the investigation.  He drove that vehicle to drug deals.  And,

12   in the Tahoe, they searched that vehicle as well.  And in the

13   Chevy Tahoe, there were new and unused purple capsules

14   identical to the ones found at different drug locations in the

15   case; hundreds of new and unused capsules in his Chevy Tahoe

16   that this drug trafficking organization used to sell crack

17   cocaine.

18       There were 500 of those purple capsules with crack found

19   at 96 Angle, 200 of those found with crack at 88 Forester

20   Street, another location used in connection with this drug

21   trafficking organization, and 15 of those capsules at the

22   residence of a coconspirator.

23       In addition to that, evidence was found at his residence,

24   the wiretap cell phone.  There were multiple cell phones

25   seized from the defendant's residence at Willmont, one of them

 1  being the phone that he was intercepted making the calls that

 2  I proffered earlier, and other calls throughout the

 3  investigation.  I think that covers, essentially, Judge, the

 4  nature and circumstances of the offense charged and the weight

 5  of the evidence against the person.  Again, I would submit

 6  that those factors support detention of the defendant.

 7      Moving to the third factor under 3142(g), the history and

 8  characteristics of the person, including his character,

 9  physical and --

10          THE COURT:  Can I ask you a question before we move

11  to that?

12          MR. MARANGOLA:  Sure.  Yeah.

13          THE COURT:  Maybe you are going to get to this.  With

14  respect to the defendant's employment or engagement with the

15  City of Rochester and the Pathways to Peace program, do you

16  have any occasion that there was any relationship between his

17  work in that program and the drug dealing here; that is, that

18  individuals who came into that program were used by

19  Mr. Jackson for drug-dealing activities or recruited for that

20  purposes, solicited for that purpose?

21          MR. MARANGOLA:  There was -- that -- those specific

22  connections to that I don't, Your Honor.  I am aware from the

23  investigation that there were times where he indicated to

24  either coconspirators or distributors that he was working and

25  he made some derogatory comments about the job, and then met

1  them at locations while he's was working to conduct drug

2  trafficking activity.  So, in that sense, there was a

3  connection, but I don't have any proof, at least at this

4  point, that he recruited folks or utilized his position with

5  the City to enhance, if you will.  I think that's what the

6  Court's asking, essentially, to enhance or to bet --

7          THE COURT:  No.  I mean, I am really asking

8  specifically whether any of the individuals that were

9  allegedly working with Mr. Jackson, whether named in the

10  complaint or unnamed in the complaint, have been identified

11  through your investigations as individuals that he met through

12  the program or recruited through the program.

13          MR. MARANGOLA:  No, Judge.  The short answer to that

14  is I don't have anything that indicates that at this point,

15  Judge.

16          THE COURT:  Thank you.

17          MR. MARANGOLA:  Should I move onto the third factor?

18          THE COURT:  Yes, yes, yes.

19          MR. MARANGOLA:  Okay.  The history and

20  characteristics of the defendant is the third character -- is

21  the third factor.  And it sets forth a number of items in A

22  and B; character, prior employment, record concerning court

23  appearances.  And, with respect to that, Judge, the Court has

24  a Pretrial Services report, which reflects that Timothy

25  Jackson is a two-time convicted felon for his convictions

1   involving both narcotics trafficking and firearms offenses,

2   exactly the same type of conduct we have here, although the --

3   he has a prior drug felony, which is set forth.  And then --

4   which he only did a year on, it looks like.  And that

5   satisfied a couple of other dispositions back in 2000.  And

6   then, the misdemeanor charge or conviction in 2003, another

7   one in 2004.

8        And then, in 2005, he has his first violent felony

9   conviction.  That's for criminal possession of a weapon with

10  intent to use unlawfully -- possession of a loaded weapon and

11  reckless endangerment.  The facts of that case are sort of

12  summarized briefly.  It is a drive-by shooting in which the

13  defendant and other gang members were arrested in possession

14  of six guns, including an AK-47, after pulling up at a house

15  on Shelter Street, stopping, firing numerous rounds into the

16  house and pulling off.

17       The driver was wearing a bullet-proof vest.  I think one

18  of two other individuals were wearing bullet-proof vests, and

19  the defendant was also a participant in that event.  That's

20  what he pled guilty to and that's what he was sentenced to 15

21  years in state prison for back in 2005.  The defendant was

22  released in 2016.  And, within several months, he committed a

23  violation of parole based on a new crime for which he was

24  convicted and returned to prison.  And then --

25            THE COURT:  Can I ask you, I was looking at that.  Is

1   it your assumption that parole was revoked based on the

2   subsequent criminal conduct or do you know that, that that was

3   the basis of the revocation?

4          MR. MARANGOLA:  I don't know that, Judge.  Maybe

5   there was another violation as well, but I know that he has an

6   arrest and a conviction during that time and was returned to

7   jail during that same time.  He was not discharged from parole

8   until 2022 it appears.

9      So, therefore, he was committing this offense while he was

10  under parole supervision, which I would submit to the Court is

11  an indicator of a far more dangerous individual who is willing

12  to commit crime while under a criminal justice sentence, and I

13  would point that out to the Court.

14     There were also -- I know some of these are sold, so I

15  wasn't going to belabor them, but there are prior bench

16  warrants, it looks like, in his past as well.  But,

17  essentially, you have a man with a very serious criminal

18  history before you charged with very serious crimes.

19     The nature and seriousness of the danger to the community

20  is the fourth factor under 3142(g).  I would submit to the

21  Court that the evidence in this case has shown that this

22  defendant is a danger to the community and that he would be a

23  danger if he were released.  That's based on the repeated

24  ongoing sales of lethal drugs that he has been engaged in over

25  a period of years; that -- his repeated, ongoing, illegal

1  firearms possession that he is involved in, I think there were

2  over a dozen firearms seized on the takedown of this case in

3  January -- on January 17th, 2024.

4      I would submit to the Court that with the age of this

5  defendant, and the fact that he has received misdemeanor

6  convictions, that didn't change his criminal ways.  Felony

7  convictions, short prison sentences, and even a very long

8  prison sentence, and he's chosen to return to a life of crime.

9  I'm submitting to the Court that he can't be trusted to not

10 return to a life of crime if he is on the streets again.

11     I would note that the Pretrial Services report also

12 recommends detention, notes that multiple charges in his past

13 have been committed while on parole or while other charges

14 were pending.  And I would also note that the -- it looks like

15 from -- that he has, according to the financial affidavit, he

16 submitted about $300 a month left in expenses.  That would

17 take a long time to save up $23,000 in cash, Judge.

18     I think that the evidence in the case shows that that

19 money is derived from his illegal activity and that a person

20 who has a substantial portion of their livelihood derived from

21 illegal activity presents a very serious danger to the

22 community.

23     With respect to the danger, I would also ask that the

24 Court consider the Second Circuit holding in *Leon* and other

25 cases describing how the danger to the community encompassed

1   within the Bail Reform Act certainly includes the dangers of

2   narcotics trafficking and, in this case, street-level armed

3   narcotics trafficking.

4        So, I don't believe at this point, Judge, I have anything

5   else.  I might have some rebuttal depending on Mr. Verrillo's

6   presentation or unless the Court has further questions.

7             THE COURT:  Yeah.  The one question I wanted to ask,

8   I know the complaint charges a conspiracy from in or about

9   2021 to January 17, 2024.  You mentioned that he was on parole

10  during some portion of that.  That is, as counsel knows, a

11  consideration that the Court weighs.  Can you tell me,

12  specifically, what activities you have evidence of involving

13  the defendant or some activities prior to February 26th, 2022?

14            MR. MARANGOLA:  We have -- there are drug sales,

15  confidential informant buys from the drug houses on

16  Angle Street before that date showing that the operation was

17  in effect before February of '22.  I think they go back to, I

18  think it's October of '21, maybe, was approximately the

19  beginning of the controlled buys on Angle Street from the

20  operation.  So, that's some of the proof of the ongoing nature

21  of it --

22            THE COURT:  All right.

23            MR. MARANGOLA:  -- before the February of '22.

24            THE COURT:  Thank you.  Mr. Verrillo?

25            MR. VERRILLO:  Thank you, Judge.  Mr. Jackson is 46

1  years old, has four children, is a lifelong resident of

2  Rochester, and he has a great deal of family support.  As the

3  Court knows, he has had family members at court both the last

4  time and then here as well.  So, he has a great deal of family

5  support.  His father and mother live on Bernard Street and we

6  have provided a number of letters on his behalf.  He had been

7  working as an outreach specialist at the City of Rochester at

8  the time of his arrest.

9      Under the statute, the Court recognizes that Mr. Jackson

10  is presumed to be innocent of the charges.  I do want to note

11  that.  The government makes two claims.  First, it claims that

12  Mr. Jackson is a flight risk.  He's been a lifetime resident

13  of Rochester.  He has no other place to go, and hasn't lived

14  anywhere else.  The record is very clear that this is his

15  home, and his family is here.

16      The government claims that Mr. Jackson is involved in five

17  kilos or more of cocaine and a substantial amount of fentanyl.

18  But, if you read the complaint and the allegations, if you

19  read it based on the face of what is in the papers, it talks

20  about small-time transactions; $2 bags, $5 bags of cocaine,

21  not kilos.

22      There were no drugs found on the defendant.  There were no

23  controlled transactions with the defendant.  The tapes are

24  subject to interpretation by the law enforcement, what they

25  believe is being said, but there's no personal knowledge or

1    personal connection with Mr. Jackson.

2        The property at 45 Willmont Street was the tenancy of

3    Melanie White, who was charged in state court.  Mr. Jackson

4    initially was charged in state court on this event.  It's not

5    Mr. Jackson's residence.  He's a guest there.  He has been a

6    guest there.  My understanding is there's one or two other

7    adults who reside there.  There's a dispute that the weapon is

8    Mr. Jackson's or that he had control or possession of it.

9        The $23,000 that was at the property we would represent

10   was income or money from the rental business.  And my

11   understanding is, from the complaint, that there were a number

12   of documents at the property that had Mr. Jackson's name or

13   his family's name on it.  My understanding is that there were

14   some records related to a property management account, and we

15   would represent that that was an accumulation of money,

16   essentially, through the rental properties.

17       During the time of the alleged conspiracy, there's no

18   proof of any act of violence towards anyone by Mr. Jackson.

19   No discharge of a weapon during the alleged conspiracy.  I

20   want to reference the items -- some of the items that

21   Mr. Marangola referenced.

22       He talks about the alleged incident with Felicia, who is a

23   long-term friend of the defendant.  He's allegedly suggesting

24   that he's going to harm her.  Well, first of all, she wasn't

25   harmed.  There's no evidence that she was harmed.  My

 1  understanding is the tone and text of the call, which I have

 2  not heard the tape, was that there was a kidding and laughing

 3  and it was a joking nature.  So, we dispute the claims about

 4  that.

 5      There's another incident where someone is upset because

 6  their aunt's house was hit.  And there's no evidence that

 7  Mr. Jackson brought a gun to this individual.  And our

 8  position is that he actually calmed the person down so that

 9  there would be no incident with any third party.  And we would

10  dispute the rest of the government's allegations with respect

11  to the complaint.

12      Prior felony record that is talked about is almost over 18

13  years ago.  And there's been no, as I say, no shootings by

14  Mr. Jackson or any claim that he physically assaulted anyone

15  since his release.

16      The Court has nine letters, character letters, from

17  individuals.  I am just going to summarize a few of them,

18  people that know Mr. Jackson.  Deacon Carlos refers to him as

19  a good person, goal-oriented.  Ms. Givens is a retired teacher

20  and church member, the defendant is patient and caring,

21  devoted to his family.  Ms. House is a fellow worker with the

22  City of Rochester.  Her experience is that Mr. Jackson has

23  helped many youth and he's compassionate and caring.

24  Ms. Peals is a state social worker and says Mr. Jackson is

25  kind and generous.  Ms. Gordon, he's honest, hardworking and

1    responsible.

2        Judge, I think there are reasonable terms and conditions

3    based on this history for Mr. Jackson.  His parents are here

4    in the front row.  Mr. Jackson's dad owns the three rental

5    properties.  As you can see, he obviously has a lot of family

6    connections and support.  The rental property is significant,

7    not only for its value, but because it generates income.  So

8    it's important to him in terms of the value of the rental

9    properties.

10       I have provided the assessed values.  There's 332 Harvest

11   Street, which has the -- and as the Court may know, the City

12   recently reassessed properties.  Three thirty-two Harvest

13   Street is 53,800.  Forty-nine Angle Street is 47,800.

14   Nineteen Angle Street is 55,000.  That's quite a significant

15   amount of value; over $150,000 of properties.  He does want to

16   move and reside with his parents at Bernard Street.  We have

17   no objection to monitoring, curfew.

18       I don't know what his employment status would be.  He was

19   working at the City but, obviously, assumption is he be

20   gainfully employed.  And obviously, you know, it's important

21   for our defense that he have full involvement in his case.

22   So, we're at an early stage, obviously, in this matter, but

23   that's our position, and we'd ask the Court to set reasonable

24   terms and conditions for bail.

25            THE COURT:  Mr. Marangola?

1          MR. MARANGOLA:  Judge, just on the -- to respond on

2     the suggestion about the rental properties.  I guess, first, I

3     would submit that posting those properties is not terribly

4     significant in that it's not the defendant's father that would

5     lose his house or his residence if the defendant didn't show.

6     It would be somebody else who he was renting from.  And,

7     second of all, I can't remember if 49 was one of the

8     properties.

9          THE COURT:  Yes.

10          MR. MARANGOLA:  Forty-nine Angle Street was one of

11     the drug houses the defendant was using.  So, putting up the

12     drug house as collateral when you are charged with using that

13     location to sell drugs I would submit is -- should not be

14     given much weight.  And finally, posting of that property,

15     even if the Court were to consider it, certainly does not

16     address the dangerousness, which I think has been established

17     by this defendant.

18          THE COURT:  There was a reference that Mr. Verrillo

19     made that the amounts of drugs at issue are sort of small-time

20     quantities and not kilogram quantities.

21          MR. MARANGOLA:  Sure.

22          THE COURT:  What is the government's response to

23     that?

24          MR. MARANGOLA:  Judge, the majority of the sales the

25     defendant's organization was involved in were small

1  quantities.  That's exactly right.  They were mostly five,

2  ten, two hundred dollars worth of drugs.  He himself sold 62-

3  gram quantities, which is certainly larger, but the ongoing

4  repeated sales of street-level drug quantities is an extreme

5  danger to this community.  Coupled with firearms, Judge, we

6  see it every day; the lethal combination of street-level armed

7  drug trafficking.

8      The defendant was obtaining kilogram quantities.  He was

9  not distributing them as kilograms.  They were breaking them

10  down, cooking them into crack and others, and having other

11  individuals package and process them for the street-level sale

12  at multiple locations to increase their profit and to prevent

13  themselves from being --

14          THE COURT:  And is there a reference in the complaint

15  to kilogram quantities?

16          MR. MARANGOLA:  Yes, Judge.  There is.

17          THE COURT:  Obtained and distributed for breaking up

18  and selling in smaller quantities?

19          MR. MARANGOLA:  Yes.  There are calls along those

20  lines.  There's calls, Judge, with respect to fentanyl.  I

21  believe there is one call describing where an individual is

22  asking -- I think it was the defendant asking for 250 grams

23  fentanyl to be sold to him.  So, considering that the weight

24  of a dose of fentanyl, which, as the Court knows, can be

25  lethal just to the touch, is in the tenth of a gram, 250 grams

1   of fentanyl is an extraordinary amount of that lethal drug.

2   So, the defendant was moving large quantities just through

3   frequent, ongoing, repeated sales to individuals at these

4   locations.

5       The -- I don't disagree that, based on the defense

6   proffer, that he has ties to the community because he's been

7   in this area a long time.  In terms of, you know, the notion

8   that he's not violent or hasn't been engaged in violence,

9   Judge, there is an additional wiretap call.  It's not set

10  forth in the criminal complaint, but I did send Mr. Verrillo a

11  copy of a draft of that transcript.

12      And, in this wiretap call, Mr. Jackson is talking to

13  Mr. Fuller about engaging in a home invasion.  And it's

14  chilling the detail that he puts in, the plan that he puts

15  together, and all of the considerations that he mentions to

16  Mr. Fuller in perpetrating this.

17      And I'll read -- I can submit a draft copy to the Court as

18  an exhibit.  I can read a couple of the excerpts from it.  He

19  states, "I got the craziest blueprint.  We can make this shit

20  mad simple."  He's essentially talking about getting an

21  individual outside of his business, as well as having other

22  people at the person's residence, where his wife or girlfriend

23  and their child are, and telling the person, we have them.  We

24  know where you live.  Tell us where the drugs or money are

25  that we're going to be looking for, otherwise we're going to

1    harm you and the people at your house are already going to be

2    in harm.

3        He states, "We going to make this shit mad simple.  They

4    bust a move and they get the" -- I'll just use N to reference

5    the word that he repeats throughout this -- "and they get the

6    [N] in there.  They then tell the [N] straight up they going

7    to scream out the addy" -- meaning the address -- "they going

8    to tell the [N] we already got people at the crib.  We got the

9    girl and the baby already, and they about to put the baby in

10   the oven.  And then if he don't, he don't tell us where

11   everything is at, we turning it on.  It already is, so get to

12   talking."

13       He states, "I am saying once we get the [N], we going to

14   tell the [N] just tell us where everything is at.  People are

15   already in the crib and such and such.  On the back street,

16   [N], we already there.  So, just tell us what we need to know

17   and everybody go home.  Baby going in the oven right now, so

18   get to talking."  And then he states, "Because now when we

19   pull up, we already know where -- we already know what we

20   going looking for, but of course we still going to flip that

21   bitch, but he going to tell us."

22       And then, he's telling Mr. Fuller, "There's cameras on

23   that fucking street.  And when I say every motherfucking

24   house, I mean every motherfucking house.  It's only one

25   fucking house there that don't got a camera.  So, [N] can use

1    that house as the line so they going to cut through the yard

2    and shit.  So y'all finna (phonetic) and the yards is mad

3    open.  Y'all don't got no cover.  I know it's going to be dark

4    as a bitch, but ain't no cover, ain't nowhere to run, ain't

5    nowhere to run.  You ain't going to be able to get to your

6    car.  There's nowhere to park your car."

7        Judge, the letters talk about the defendant's character.

8    I would submit that that call speaks quite a bit to the

9    defendant's character and his willingness to victimize

10   individuals in this community, and would ask that the Court

11   detain the defendant on danger as well as risk of flight.

12   Thank you.

13           THE COURT:  Mr. Verrillo, you did receive that

14   transcript?

15           MR. VERRILLO:  Yes, Judge.  I did want to comment on

16   it.  I just received it late yesterday and I, thankfully, I

17   was able to talk to my client for a few minutes before court

18   on this.  The transcript is dated January 3rd.  Alleged -- the

19   call.  And it talks about something involving a third party.

20   Doesn't say they're going to invade anybody or kidnap anybody.

21   But, again, the problem is the government is interpreting

22   phone calls, not having anyone with personal knowledge of

23   this, no corroboration.  There's no event that occurred, no

24   one is -- I don't believe there's any claim that someone was

25   invaded or kidnapped.

1    There's a discussion that takes place about a third party.

2  So, that's what we have.  We have nothing in terms of any

3  corroboration, anything happening, anybody being attacked.

4  So, that's all I can say about it.  I, again, just getting it.

5  I did want to say one other thing.

6        THE COURT:  Yes.

7        MR. VERRILLO:  There's a claim about -- I think,

8  Mr. Marangola is talking about this Candalario Lopez

9  individual, where there's a discussion about getting some

10 drugs, allegedly.  And it talks -- at one point, it refers to

11 a key.  It says key or something to that effect.  And, if you

12 accept the transcript, it says that the individual, allegedly

13 Mr. Jackson, says no, I don't want that.  And then there's a

14 reference to a hundred.  Now, it's unclear whether a hundred

15 is baggies, a hundred is grams, what have you.

16        THE COURT:  Right.

17        MR. VERRILLO:  But that's what it says.  So, I just,

18 you know, again, having handled many of these cases, and the

19 Court has usually -- I shouldn't say usually, but commonly,

20 when someone is moving kilos, there's other evidence.  There's

21 cash, significant cash.  Not, you know, in my opinion, there's

22 a significant amount of drugs, so forth.  So, I haven't seen

23 that so far, and I think that's something the Court should

24 consider.

25    They have been investigating Mr. Jackson for at least,

1  what, for a number of months?  Or, actually, from October --

2  of November of '21 would be, what, a year and a number of

3  months.  And they have been tracking him.  And I think the

4  Court should consider that.  They've been tracking him and

5  following or whatever they have been doing.  This is what they

6  have.  And so, I think the Court has to weigh that as well.

7          THE COURT:  I would like to review the call which the

8  government interprets as a threat to a worker if she quits,

9  that the defendant says, if you listen to it, you can tell

10 it's jah killer (phonetic).  I'd like to listen to that,

11 Mr. Marangola, and I would also like to listen to the call

12 that you just referenced, as well as look at the government's

13 transcript of that call.  I'll review those calls, make a

14 determination.

15    The record should reflect that I have carefully reviewed

16 the letters that have been submitted by the defense.  I did

17 that before taking the bench.  I am familiar with what they

18 say.  I will review the additional calls after I receive them

19 from the government, which I assume will probably be today

20 or -- today or Monday, and consider the matter further.

21    I think the government has, frankly, has a very strong

22 case for detention, not on risk of flight, on dangerousness.

23 At least that's my assessment, but I do want to give it

24 further consideration and I want to consider these calls as

25 well as the defense's proffer that the call between --

1   allegedly between Mr. Jackson, Mr. Fuller, and another

2   defendant was not intended to be taken seriously what is being

3   discussed.

4       Mr. Verrillo, put aside the issue of the government's

5   detention motion and when I am ready to render a decision on

6   that, tell me what you would like to do.  Would you like a

7   preliminary hearing or a further status conference?

8           MR. VERRILLO:  Judge, I did get some discovery from

9   the government.  I don't know if there's more coming, but

10  mainly calls, you know, the calls and so forth.  So, I have

11  obviously focused on the calls related to -- allegedly related

12  to my client.  So, what I am thinking is -- if I could just

13  have one -- I think, Judge, if we had a status within 45 days

14  or so, hoping I can get through whatever discovery we have and

15  then see where we're at.  And I would reserve on a preliminary

16  hearing at this point.

17          THE COURT:  Okay.  All right.  Let me go ahead and

18  get that status conference in the books and I'll call you back

19  when I am ready to render a decision on the government's

20  motion for detention.  Unless, for any reason, Mr. Verrillo,

21  there's any application for me to hold off on making a

22  decision, but I expect that you would want a decision, even if

23  adverse to Mr. Jackson, you would have the opportunity to seek

24  review of that.  But should you have a different view of that,

25  you can let me know.  You know what my -- at least my

1   preliminary thinking is.  Okay.  So, let's see.  How about

2   March 20th at 9 o'clock?

3          MR. VERRILLO:  That's okay with me, Judge.  Yes.

4          MR. MARANGOLA:  That that's fine with me, Judge.

5          THE COURT:  All right.  We'll put it on for status

6   March 20th at 9 o'clock.  And, Mr. Verrillo, you asking for an

7   interest of justice exclusion between today and March 20th?

8          MR. VERRILLO:  Yes.

9          MR. MARANGOLA:  Government joins that request and I

10  am sure there will be some additional voluntary discovery

11  that's provided.

12         THE COURT:  Okay.  Time is excluded between today and

13  March 20th in the interest of justice between -- excuse me --

14  in the interest of justice under 18 USC, Section 3161(H)(7).

15     I find Mr. Jackson's interest, the government's interest,

16  and the public's interest in both a speedy indictment and a

17  speedy trial are outweighed by Mr. Jackson's interest in

18  having enough time to discuss the charges more fully with

19  Mr. Verrillo, and especially to allow the defense time to

20  continue their review of voluminous discovery relating to the

21  charges, the wiretap evidence, there may be surveillance

22  evidence as well and other evidence, to allow Mr. Jackson to

23  discuss that with Mr. Verrillo, obtain Mr. Verrillo's advice

24  about how to proceed and consider whether to ask for a

25  preliminary hearing.

1    (Proceedings concluded at 9:59 a.m.)

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2

3          In accordance with 28, USC, 753(b), I certify that

4   this is a true and correct record of the proceedings held in

5   the United States District Court for the Western District of

6   New York before Judge Marian W. Payson, on February 2nd, 2024.

7

8

9                              <u>s/ Megan E. Pelka, RPR</u>

10                             Megan E. Pelka, RPR

11                             Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25